We're going to keep going. We're going to call the consolidated cases People v. Joshua Hanna 513-061 and People v. Trent Scott 513-0602. And, Mr. Hornick, are you going to consolidate your argument? Yes. Okay. Yes. Okay, we appreciate that. You may proceed. Your Honor, counsel, this is the appeal of the court's order granting the defendant's motion to quash arrests and suppress evidence. There is no factual dispute in court now. There was no factual dispute in the evidence. And this court should give deference to the court below in its factual findings. But, so the people have, you know, are making no argument that the court's factual findings are manifestly erroneous, but are making the argument that its order of suppression is manifestly erroneous and the standard of review is de novo. The facts are important, so I'm going to briefly go through them. At 1045 at night on September 14, 2013, Sheriff's Deputy Lawrence and another officer were on patrol. They had gone down Township Road 1150 toward the Wabash River, and 1150 tees into a private road that runs north and south along the Wabash River. Along that private road, cabins are located, and they do turn south on this private road. The reason they were patrolling was, one, the railroad had asked them to check out a trestle for trespassers, and there had been, in the past, reported burglaries of cabins along the Wabash River on this private road. Did they really need a reason to be on the road? Excuse me? Do police really need a reason to be on the road patrolling? No. Would it have mattered if they were a conservation officer? Would it have made a difference in this case? I don't think so. I don't think so. But they were patrolling, one, at the request of the railroad, and two... But the argument is that that was a long time ago that that request had been made, and, like, more than a month, and really no burglaries of any imminence. I mean, it seemed like that there was a lot of discussion in the briefs about whether they should have been there at all. Well, that gets into whether the defendant himself made a prima facie case. Could you speak up a little? I'm sorry. That goes to the issue of whether the defendant made a prima facie case as to whether he had a reasonable expectation of privacy in that access road. Is there any difference between your private road and your driveway? Yeah, because in this case, the road is used to access the cabins, other cabins. What's a road easement, or what is it? A private road easement, I guess it might be. Right, yeah. It is on... To get to the Hanna cabin, you have to pass along the road around a half to three-quarters of a mile, depending on which... It's some distance. But it is Hanna himself testified that to get to the Hanna cabin, you have to pass by eight to ten other cabins first. And the road does go on past the Hanna cabin because Deputy Lawrence goes past the Hanna cabin in his squat car and turns around and comes back. Now, the point is, the Fourth Amendment protection extends to houses, persons, papers, and effects, and the curtilage. This court below merely made the finding that it was a private road. But that doesn't settle the question of whether it has Fourth Amendment protection, because it's not curtilage. So say you. What? So say you it's not curtilage. I think the other side might disagree with you. They might. They might. But it is... The point is, it is a common access road in which it is not the kind of thing that has... That's associated closely with the activities of the house or the home. It is an access road that anyone who has business on that road can use. It is not... I don't think the road is being called the curtilage, is it? It's a campfire. Precisely. The court did not find that the access road was curtilage. The court found merely that it was a private road. And that does not settle the question of whether that place, whether actually, you know, the Fourth Amendment protects persons, not places. And it doesn't really settle the question of whether either defendant had a reasonable expectation of privacy in an access road. Is it posted or anything? Like, private road do not enter or anything like that? There is no testimony that it was. And it has to be recalled that the defendant had the burden to make a prime official case that then sufficient to shift the burden to the state to rebut. And as it pertains to this private road, they don't... The testimony that was elicited from Hannah does not establish that this private road is something that he had a reasonable expectation of privacy in. Because it's Hannah himself who testifies that it's a private road, that you have to drive past eight to ten cabins to get to the Hannah cabin. And that, you know, it follows from that. It's reasonable that anyone who had a cabin along that road could drive on that road. Therefore, it follows that the defendant himself, either of them, had no reasonable expectation of privacy in a commonly used access road. This is not the same thing as a private driveway. Okay, let's concede that point. Yeah. I'm sorry. Let's concede that that is true. But then there's many more steps. It's what you do in the next step that becomes a problem, right? He stops his car. Now does someone have an expectation that a police officer is not going to sneak up on them in the woods? Because he stops his car and he comes through the woods, right? No. What does he do? No. He walks on the roadway. It's explicit. The testimony is explicit. The officer does. He stays on the roadway. Okay. He stays on the roadway. And this is important. It's very important. Why is that important? Because he is in a place where the defendant can't object to him being there. I mean, he is in a place that is analogous to an open field that is not protected by the Fourth Amendment. The Fourth Amendment only applies to persons, houses, papers, effects, and curtilage. And he hasn't seen a crime. Yes, he has. What is the crime? Okay. He has seen. The court's order below says that while the officer is driving on the access road, he saw both defendants drinking. From what? Beer. How do you know it's beer? The court made that finding. They could see it. Yeah, he sees it. How close was he? What? To the beer. The officers testified and the court found that the officer could see them consuming beer while he was driving on the roadway. He could see this. Do you know how far away that was? Did he say, was that behind the house, on the side of the house, in front of the house? I don't know where it was. The officer testified that when he drove on the access road, he saw defendant Scott sitting on a blue cooler and Hannah sitting around a campfire to the south of the cabin, which was about 20 feet away from the cabin. To the side or to the back or to the front? 20 feet where? He's to the south of the cabin. I don't know where the squad car is. Is it to the north of the cabin or is it to the south? The squad car is driving south, and as he's driving south, he looks at the south hand side of where they were. That's the side of the cabin. The shape of the cabin is not described. Oh, okay. But the campfire is to the south of the cabin. And as he is driving south, he looks and sees. And he can see the defendants drinking. And the point is he knew that Hannah was underage because he had familiarity. He could tell who it was. But he doesn't just merely see them drinking. He also hears Hannah say, it's the cop, and he sees them run. And all of this happens while he's on the road. He is not in a place where he doesn't have a legal right to be. But one last question. If parents have given permission to drink, it's not a crime. Is that true? So he doesn't really know if there's a crime because he doesn't know that parents are not present. Right, and he sees what should give him reasonable suspicion to suspect a crime and to investigate it. Maybe to investigate, but he hasn't seen a crime yet. Hasn't seen a crime. I don't put it in such ways. But I'm not saying that he has a probable cause at this point. What I'm saying is that he has reasonable suspicion because he sees them run in a place where there has been reported burglaries. And it's 1025 at night. And they run announcing it's a cop because they're running because it's a cop. And that is enough to raise reasonable suspicion as well as the drinking. Are they sitting around a campfire? They were, and they ran from the campfire. A lot of burglars sit around campfires. That's what I'm getting at. He had a reason to believe it was a burglar because he was sitting around a campfire. Well, I'm just trying to get a straight answer. No, they ran. Okay, so. They ran. And as they say, Hannah says it's a cop. And they run. And so that would lead a reasonable suspicion that they weren't at the campfire legitimately. You know? So, I mean, because you can't judge reasonable suspicion by, you know, what you learn later. But what occurred at that moment, they run. But this police officer knew one of the boys, knew he was underage, but also knew that it was his parents' camp. No. At that point in time, he did not know that it was the Hannah cabin. He knew that Hannah had a cabin someplace out there at Riverton, but he didn't know it was that cabin. I see. What he sees is people run, and he knows one of them is underage and they're drinking. And whether he doesn't know whether the other person is underage or not, and that would raise an issue of whether there was delivery, unlawful delivery of alcohol to a minor. There were lots of things that he saw that required him to investigate. Okay. Unless there are other questions or unless you want me to continue. No, no. We're going to cut you off there and we'll give extra time for Kelly. But you'll have a chance for rebuttal. All right. Okay? Thank you. Thank you. Situation you're not usually in. I wasn't up around the table. May I please report? Counsel? My name is Maggie Heim. I'm representing Mr. Joshua Hannah and Mr. Trent Scott in this matter. Now, the state is framing the issue as whether there's a physical intrusion onto the dirt lane and whether that was a Fourth Amendment search. But the defendants didn't complain of a search of the lane. They were complaining about the search of the curtilage of the cabin or the campfire area. And what's relevant to that analysis is that the surveillance took place at night. The officers at no point could justify their position on the private lane or sneaking back in the dark. And as a result, we ask that this court affirm for the trial court didn't manifest the error in finding that a warrant was required for this type of investigation into the campfire area. Now, I'd like to first just briefly touch on a factual issue that came up, which is whether or not the deputy was in the car when he first saw them drinking. We've made the argument that the deputy couldn't justify his position on the lane at all, but he certainly didn't see evidence of drinking, according to his testimony, until he walked back on foot. And the state cites to what paragraph three from the order, which gives a brief rundown of the facts in some of the deputy's testimony, but it's only in taking that out of context that they imply the court found the deputy was still in the car when he actually saw them drink. And if you look at his testimony, which is cited on the same page in the reply brief, you see that he testifies he didn't see them drink until the second time. And the second time he saw them was when he was on foot. Now, I think it's important that the state's argument that this court reversed the trial court order, but the argument for reversal requires making assumptions, like any way you slice it. I think the most glaring assumption is that the state wants this court on appeal to find that the dirt lane was akin to a public roadway. But the state presented no evidence on the lane usage. The only evidence presented was that that entire parcel of property was owned by John Anderson, and that it was used by Mr. Hanna and his friends at a cabin owned by his father on Mr. Anderson's property. This evidence supports an inference that this is like an extension of a driveway. There's no evidence about cabins being further down the road past the Hanna cabin, and there's no evidence that any of the other cabins, whether they're on Anderson's property or the Piker brothers, had anyone in them at that time. It could very well be these are cabins where he has big family reunions. We have no idea, because the state didn't approach this theory in the trial court and didn't present these facts. Now, the state also claims that we haven't made our prima facie case that there was a fourth woman violation. But this was done in the trial court, and defense counsel mentioned making this prima facie showing in its closing argument. Counsel presented evidence that the young men were at all times seated in the curtilage of a cabin, which was in no way exposed to any public vantage point. He further presented evidence that the deputy approached in the dark, on foot, with his flashlight off, in order to investigate activity within the curtilage. He further really pushed the deputy on why exactly he was on the lane in the first place. That was not something that defense counsel was willing to just accept. He was legitimately on patrol. I think the trial court was swayed by that cross-examination, because in paragraph 11 of his order, he points out the deputy claims he was there in part to investigate this railroad, but the railroad had nothing to do with getting to the Hanna cabin, which is an extra quarter or half mile down the road. So that seems to imply that the trial court recognized this deputy is stretching the truth to try to justify his position. Yeah, it seems to me that if you're out on a dark night, you need a flashlight. I think you do need a flashlight. Turn it on. Right? I mean, I think those are the facts that are presented to the trial court, and that's all the in-between that was making its inferences strong. And Justice Cates, you asked a question about, you know, is it important that the officers had a reason to patrol this lane at all? Was there a closer way to get to the railroad by another road, the trestle? I thought I saw that. Maybe I didn't. Well, so I think what happens is the main road goes up, and the railroad is almost immediately to your right, south of the main road. So you can see it from the main road, but you might need to go a little bit down the lane on the Piper Brothers' land in order to reach it. But it's when you continue further down. I'm not sure if you can reach it any other way than by that main road in the dirt lane. Does it really matter, though, if it's private or not? I mean, it's turkey season, and if a deputy wants to go out and see if anybody's poaching deer instead of turkey, can't they walk around and look? I mean, the reality is even if something ends up incidentally being exposed to someone that you don't want to see it, that doesn't necessarily diminish the reasonableness of your expectation of privacy. I agree, but that's what I'm saying, is there's an expectation of privacy that is somehow independent of where you walk, and you might see something, but then doesn't the question of whether there's an expectation of privacy arise? I mean, it's not where you are originally. It's what happens in the next step. What do you see? Are you supposed to see it from where you are? Well, so I think a part of the question is it's both what do you see and why were you there when you saw it, and that's why the question of why was a deputy in that position and did he have any right to be there becomes very important because if he were, say, on a call, called down an emergency, this would be a very different case, but he wasn't, and like all the cases that are relied on by the state have this caveat, which is deputies can report anything they see in plain view, but they have to explain why they're in that vantage point and why it's appropriate, and they can do that by showing it's a public or akin to a public area, like a common hallway in an unlawed department building. They can show that the deputy was acting within an implied license, but in this case, none of that's true. It's very clear that the only public road was a half mile away, and the only evidence was that this was a lane going through John Anderson's property, presumably to reach it from the public road. The state presented no evidence on the lane's usage, and they can't now ask a court of review to find in the absence of evidence that, well, it was probably like a public road. There was also no implied license and no consent. There's no such thing as a tarry search in the curtilage of a cabin, and the reason there's no implied license or consent here is because this was a very late hour, and the U.S. Supreme Court recently considered this in Florida v. Jardines. They even said, agreed, that if you're going to approach a private home late at night, you're going to need an express invitation. We don't expect our neighbors to come calling at 10.30 p.m. I also think that the officer's conduct in this case belies the idea that this was in any way a consensual or implied license. The officer didn't just drive by, see something amiss, and go check it out. He drove by once, circled back, drove by again, saw everyone was gone. At that point, he could have parked, knocked on the cabin, made sure everyone was okay, but he didn't. He drove further up the road and parked and walked back in the dark. I think that's where you find the Fourth Amendment violation, and that's what the trial court was responding to when it suppressed the evidence. Just to quickly summarize, the state's argument for reversal requires finding that the court's curtilage analysis was manifestly erroneous. That's a very fact-intensive analysis, and this court should not reverse it unless it's manifestly erroneous. I think in this case, that can't be true, where the campfire was within 20 feet of a private cabin. The state also needs you to find that the trial court made a fact finding that the officers made a fact finding crediting the officer's testimony that he was standing where he said he was standing at all times. I think that even if he was on the lane, there's a Fourth Amendment violation, but there is no express fact finding that he was standing on the lane when he came back in the dark, and the trial court was free to dispute that. If the state wanted a clear finding, they should have asked for it when they got the court's six-page ruling. Finally, the state is requiring this court of appeal to assume that the dirt lane was akin to a public thoroughfare despite a total lack of evidence presented in the trial court. This court should reverse the trial court's order in the absence of evidence. We ask that this court affirm where the Fourth Amendment was violated and the trial court was not manifestly arraigned against. One more question. Could you find a violation of the Fourth Amendment even if the campfire was not deemed curtilage? Does it have to be curtilage to find a Fourth Amendment violation? I think it's perhaps a much closer case if the campfire is not curtilage. The benefit of knowing that the campfire is curtilage is that even the open field case is recognized that when you're out of doors, it seems obvious you can't expect privacy when you're out of doors, except when you're in the vicinity of your home, everything changes. Okay. Thank you very much. Well, in paragraph 3 of the court's order, the court says, of Deputy Lawrence, he observed the defendants were consuming beer as he drove by that private lane. So that part is settled. The deputy goes and parks his car up at Chief Ackman's cabin, and then he walks back. It was reasonable for him to walk back without his flashlight on because the people he had observed at a cabin saying, it's a cop and running, he heard that from the road. I thought he heard it from the woods. He heard it from the road? No, no, he was in his car. Oh, he heard it when he was in his car. In his squad car. He was in his squad car driving south past the cabin. He hears Hannah, he sees Hannah and he sees Scott sitting around the campfire drinking beer, and he hears Hannah say, it's a cop, and they run. He doesn't know at that point in time that the cabin belongs to Hannah's father. He doesn't know that. All he knows is that there have been burglaries in that area, and he doesn't know why these people are fleeing at his approach. And so he goes back and parks his squad car, and he walks back by foot. I thought you said he knew Hannah at that point. He knew who Hannah was. And he knew the age of Hannah. And he knew his age. So he knew that there was, you say he didn't know, but he did know allegedly. He knew Hannah, but he didn't know it was Hannah's father's cabin. He didn't know that Hannah had a legitimate reason to be around that cabin. And he has a reason to question it because Hannah says it's a cop and he runs, which is suspicious activity. And that, coupled with the officer's knowledge that there had been burglaries there in the past in that area, it amounts to reasonable suspicion to explore why these people are at the cabin and why are they running and why is Hannah drinking who's underage, and did Scott supply that alcohol, and is Scott underage or overage. All these questions are things that the officer needs to explore. And the reason he comes back on foot and with his flashlight off is he knows that these people have run because when he drives back past, when he turns around and he's driving back north, back past the cabin, they're nowhere to be seen. So he wants to find who these people are, what are they doing there, and. . . See, I thought she already knew who she was. What? I thought he knew Hannah and Hannah's age. When he saw Hannah and knew Hannah and Hannah's age when he drove the car south. Right, he did. Okay, so he didn't want to find, he wanted to find out who the boy was? Not the girl, he knows who they are. He doesn't know what they're doing at the cabin if they have a loser. I thought he said he saw them drinking beer. Yes, he sees them there, but he doesn't know that it's Hannah's father's cabin. Okay, okay. He doesn't know why they're there, and he wants to, and he has a reason to explore what they're doing, why they're there, and whether Hannah has permission to drink, or whether Hannah's father is there, or has, you know, whatever, all of those things. He has loads of resources to come back. And it's reasonable for him to come back walking on the road because they have run from him already, and he wants to simply apprehend them and question them. Now, he approaches the cabin on the road going south, and from the road going south, he sees they're back around the campfire and they're drinking. He sees a wine bottle and he sees beer bottles and the like. So he asks them, why did you run from me? And at this point, it's not clear when he crosses off of the road onto the property. But in any event, whether he crossed off of the road onto the property and whether the area around the campfire is curdled or not, it was reasonable for him to go up and explore whether they had a legitimate right to be there at that time. And even though it's 1025 at night, it's not like he's walking up and waking people up. These people are already out there, always in an open area where they are doing nothing to conceal their activities from any path of crime. And we ask the court, unless there are other questions, to reverse and remand. Thank you very much. Okay, this matter will be taken under advisement and the disposition of the court.